**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Case No. 4:07cr0023** |
| | : | |
| **Plaintiff,** | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| | : | |
| **TYTHIN ANDERSON,** | : | **OPINION & ORDER** |
| | : | |
| **Defendant.** | : | |

This matter is before the Court on a *Motion to Suppress* (Doc. 19) filed by Defendant Tythin Anderson ("Anderson"), in which Anderson seeks to suppress all evidence resulting from an allegedly unlawful traffic stop on December 26, 2006 in Youngstown, Ohio.  During the stop of a vehicle in which Anderson was a passenger, police officers discovered a loaded 9mm handgun in Anderson's coat pocket.  A subsequent indictment charged Anderson with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).

Anderson now seeks to suppress all evidence resulting from the traffic stop, including the gun, ammunition, and a statement he allegedly made on his cell phone in the back of the police cruiser.  He argues that the traffic stop was unlawful because the sole reason for the stop was that the vehicle in which he was riding was erroneously on a list of stolen vehicles at a police briefing, despite the fact that, over four hours earlier, the vehicle had been reported recovered and removed from the department's computerized database of stolen vehicles.  The Motion to Suppress has been

fully briefed, and the Court held a hearing on the motion on May 7, 2007.  Accordingly, this matter

is ripe for adjudication.  For the reasons articulated below, the Court **GRANTS** Anderson's Motion

to Suppress and orders that all evidence obtained as a result of the unlawful traffic stop in question

be **SUPPRESSED**.

## I.    BACKGROUND

On December 26, 2006 at 2:42 p.m., Marvin Crenshaw reported to the Youngstown Police

Department that his vehicle, a red 1991 Chevy Cavalier, was stolen.  According to police records,

an officer went to the scene and completed a stolen auto report.  The report indicates that the car was

entered as stolen in Ohio's Law Enforcement Automated Data System (LEADS), a statewide system

that provides "computerized data and communications to the various criminal justice agencies of the

state."  O.R.C. § 5503.10.  There is also an indication on the report that it was "cleared" at 3:45 p.m.,

which is the time the report was sent to the station and when the car was entered into LEADS as

stolen.[1]

About two hours later, at 4:35 p.m., Crenshaw reported that his vehicle had been returned

to him.  The same officer who completed the stolen auto report returned to the scene, confirmed that

the car was recovered, and completed a recovered auto report.  That report indicates an affirmative

answer in the "Leads Cancelled" box, and the officer wrote in the narrative section that "Officer

---

[1]  The only evidence that the car actually was entered into LEADS at this time and,
similarly, that it was removed from LEADS later when it was reported recovered, are these
vehicle reports.  The only confirmation that the car was or was not listed as stolen in LEADS is
after the traffic stop (around 10:30 p.m.), when Officer Zubal learned that the car was not
actually reported stolen in LEADS.  The parties, however, do not dispute that the officers' stolen
and recovered auto reports were processed in LEADS when the reports indicated that they
"cleared."  For purposes of determining when the status of the vehicle was updated in LEADS,
therefore, the Court also assumes that LEADS was updated when the reports "cleared."

cancelled vehicle from leads." The recovered auto report was "cleared" at 5:10 p.m., which, again, is when the report was sent to the station and when the car was removed from LEADS as being reported stolen.

That same evening at 9:30 p.m., Officer Chad Zubal of the Youngstown Police Department arrived at the police department to begin his "midnight shift." As was customary, Officer Zubal attended a "roll call" prior to signing out a vehicle for patrol. Officer Zubal testified that roll calls are meetings in which the commanding officer (the highest ranking officer of the shift) would update other officers about any events that occurred since their previous shift - "mainly any felony crimes that have occurred, a big part of it is reading off cars that were stolen for us to be on the look out for basically." (Transcript from suppression hearing (hereinafter, "Tr.") at 7.) On this particular evening, Detective Sergeant Ismael Caraballo conducted the roll call meeting and read to the officers a report of stolen vehicles, which included Crenshaw's red 1991 Chevy Cavalier with its license plate number, despite the fact that this vehicle was removed from LEADS over four hours before the 9:30 p.m. roll call. Sergeant Caraballo did not testify at the suppression hearing, but Officer Zubal stated that officers conducting roll call reports prepare the reports themselves. The United States did not put on any other evidence regarding the preparation of roll call reports generally, or of how Sergeant Caraballo compiled his report on that specific night. The government also offered no explanation as to why the 1991 Chevy Cavalier appeared on that report.

At 10:18 p.m., after starting his patrol, Officer Zubal noticed a red 1991 Chevy Cavalier drive past him while he was parked in his cruiser. Officer Zubal pulled out behind the vehicle, which later stopped at a red light, to check the license plate and confirm that it was the vehicle described at roll

3

call.[2]  After confirming that this was the same vehicle described at roll call, Officer Zubal called

dispatch on "Channel 1" to inform them that he was behind an occupied stolen vehicle.  Officer

Zubal testified that Channel 1 was the radio channel through which officers communicate with other

officers and with radio dispatch.  He also testified that, if he wanted to check LEADS to determine

whether the vehicle was still reported stolen, he would have to call a separate room - the index room

- on a different channel - "Channel 2."  The index room is the place officers would contact to run

license plates, social security numbers, check for warrants, etc.  Officer Zubal explained that, if he

switched over to Channel 2 to run the Chevy's license plate on LEADS, he would have lost

communication with dispatch on Channel 1.  That would be an undesirable result because dispatch,

and other officers, would not be aware of the progress of the traffic stop.  In addition, radio dispatch

and the index room physically are located in different buildings - the index room is in the police

department and radio dispatch is in city hall next door.

When Officer Zubal pulled out behind the red 1991 Chevy Cavalier, he noticed that the

vehicle had three occupants, and that the back seat occupant looked back at him twice. Officer Zubal

described this as nervous behavior that, based on his experience, indicated that a vehicle pursuit

might ensue.  After Officer Zubal called in his position to dispatch, another cruiser pulled in front

of the Chevy as it was stopped at the red light.  Eventually, a total of four, one-officer cruisers were

at the scene, and the officers conducted a felony stop with guns drawn.  Officer Zubal called the

driver out, placed him in handcuffs, and placed him in the back seat of his cruiser.  Another officer

called the front seat passenger out of the car and determined, by asking, that he had a loaded

---

[2]  Officer Zubal wrote down the details of the cars reported stolen at roll call, including
their license plate numbers, and brought that information with him on his patrol.

handgun.  Officer Zubal then asked the defendant, Anderson, while Anderson was still seated in the rear passenger seat, whether Anderson had any weapons.  Anderson responded that he had a handgun in his coat pocket, and Officer Zubal reached in the car and pulled the gun from Anderson's inside coat pocket.  Officer Zubal then asked Anderson to exit the vehicle and placed him in handcuffs.

After the occupants of the vehicle were all in handcuffs, Officer Zubal checked the vehicle on LEADS and discovered that it was no longer stolen and was being driven by the registered owner, Crenshaw.  At no time during the stop did the officers ask Crenshaw whether he owned the vehicle.  Upon discovering that the vehicle was not stolen, Officer Zubal released Crenshaw to his vehicle after he determined that Crenshaw's drivers license was valid and that there were no outstanding warrants for his arrest.  At that point, Crenshaw was free to leave the scene in his vehicle.  Officer Zubal testified that the entire encounter lasted approximately ten minutes.

Officer Zubal then drove away from the scene with the two passengers of the Chevy Cavalier, including Anderson, in the back of his cruiser.  His police report indicates that "[a]t one point Anderson answered [a] cell phone which was on speaker phone.  Anderson spoke with an unknown female stating 'We about to go to jail . . . they found my gun.'" (Arrest Report, Doc.19-5, at 2.)  Officer Zubal testified that he never saw a cell phone, he did not find a cell phone when he patted down Anderson for weapons, Anderson did not turn in a cell phone when he was booked into the jail, and Officer Zubal did not find a cell phone in his cruiser.

Prior to this incident, Anderson previously had been convicted of robbery in February 2001.  On January 9, 2007, an indictment charged Anderson with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  On May 23, 2007, Anderson moved to suppress all evidence obtained as a result of the traffic stop on December 26, 2006, which the Court

5

now addresses.

## II.    DISCUSSION

Anderson's Motion to Suppress requires the Court to address three questions: (1) whether the traffic stop was an illegal seizure under the Fourth Amendment; (2) if so, whether a clerical error made by a high-ranking police officer, leading to a violation of the Fourth Amendment, warrants application of the good faith exception to the exclusionary rule; and (3) if it does not, whether, under the circumstances of this stop, the scope of the exclusionary rule reaches the evidentiary fruits that Anderson seeks to suppress.

Each party asks the Court to adopt a categorical approach to this inquiry.  Thus, the defendant argues that: (1) where the probable cause or reasonable suspicion upon which a warrant or search is based arose from a clerical error, any search or seizure based on that error violates the Fourth Amendment; (2) the good faith exception to the exclusionary rule does not apply to clerical errors made by law enforcement; and, thus, (3) all evidence obtained from such a search must be suppressed.

The government, on the other hand, argues that this Court should look only to the objective reasonableness of the officer conducting the search to determine whether suppression of the evidence obtained thereby is warranted.  Thus, the government argues that, whether the Court is examining the underlying validity of the search or the application of the good faith exception to the exclusionary rule, the result should turn only on whether the executing officer acted in an objectively reasonable manner in light of the facts he was given, whether or not those facts turn out to have been mistaken.

### A.    The Analytical Framework

The Fourth Amendment prohibits the government from conducting unreasonable searches

and seizures.  It states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the places to be searched, and the person or things to be seized.

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). In the context of traffic stops, the Supreme Court has explained that "law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity." *United States v. Hensley*, 469 U.S. 221, 226 (1985) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)).  "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal property.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)).

In this case, Officer Zubal's suspicion that the occupants of the Chevy Cavalier were engaged in criminal activity was based on the roll call report he received from Sergeant Caraballo that a car matching its description, including its license plate number, was reported stolen.  Although Officer Zubal also mentioned that he noticed a passenger look back at him twice, the government concedes in its briefing that "[t]he reason the officer stopped the vehicle was due to his belief that the vehicle was a stolen vehicle described as such at the roll call before he began his patrol."  (Doc. 20 at p. 3.)  The references to the passenger's behavior related only to the reasons why Officer Zubal approached the situation cautiously and why he thought a pursuit might ensue, not the reasons that he believed

criminal activity was afoot.  Officer's Zubal's reasonable suspicion of criminal activity that prompted the traffic stop, therefore, is based <u>solely</u> on the fact that the car was identified as stolen on the roll call report.[3]

If the roll call report identifying the Chevy Cavalier as being stolen was accurate, there is no question that the stop would have been justified.  *See United States v. Bradley*, 1990 WL 124205, at *2 (6th Cir. Aug. 27, 1990) ("The investigating police officer had recently received a dispatch reporting that a car fitting its description, including license plate number, had been stolen.  Those circumstances justified the police stop.").  There is no dispute, however, that the roll call report was inaccurate due to a clerical error, and that the traffic stop was based on that error.

In cases where a clerical error (e.g., failure to update records, transposing numbers in running a license plate check, failure to report that a warrant has been served or quashed, etc.) leads to a search or seizure, and the defendant moves to suppress the evidentiary fruits of that search or seizure, courts have taken a variety of approaches in determining whether the evidence should be admitted.  Some courts assume that a search or seizure based on a clerical error is unlawful, and only address whether the good faith exception to the exclusionary rule otherwise permits the evidentiary fruits of

---

[3] Neither party addresses whether the scope of the stop (i.e., guns being drawn and the driver being handcuffed and placed in the police cruiser) went beyond the original purpose of the investigatory stop, such that probable cause would be required.  *See United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991) ("When actions by police exceed the bounds permitted by reasonable suspicion, the seizure becomes an arrest and must be supported by probable cause.").  In their briefing, both parties refer to the reasonable suspicion standard, and Anderson does not allege that the scope of the stop exceeded its original purpose.  "Although the use of guns, handcuffs, and detention in a police cruiser do not automatically transform a *Terry* stop into an arrest, these displays of force must be warranted by the circumstances."  *Smoak v. Hall*, 460 F.3d 768, 781 (6th Cir. 2006).  In this case, the circumstances described by Officer Zubal at the suppression hearing, particularly his personal belief that he was stopping a stolen vehicle with multiple occupants, clearly support the type of stop that occurred, a point not contested by the defendant.

8

the unlawful seizure to be admitted into evidence.  *See United States v. Santa*, 180 F.3d 20 (2d Cir. 1999) (considering only whether the good faith exception excluded evidence seized after arrest pursuant to vacated warrant); *United States v. Williams*, 1998 WL 276460 (4th Cir. May 27, 1998) (unpublished decision) (considering only whether the good faith exception applied to admit evidence seized after arrest pursuant to a warrant that had already been served).  Other courts address the questions separately, examining first whether the police error rendered the search unreasonable and, if so, examining whether the good faith exception should apply to permit the use of that evidence. *See United States v. Herrera*, 444 F.3d 1238 (10th Cir. 2006).  Other decisions also treat the questions separately, but, as the government would have the Court do here, look at the officer's reasonableness in relying on his own mistake both for purposes of determining whether there was a Fourth Amendment violation and for purposes of determining whether the good faith exception applies.  *See United States v. De Leon-Reyna*, 930 F.2d 396 (5th Cir. 1991) (en banc) (per curiam) (finding that good faith reliance on police mistake could be considered in constitutionality of stop and permitted reliance on good faith exception).

The seminal Supreme Court decision involving the application of the good faith exception to cases involving clerical errors, *Arizona v. Evans*, 115 S. Ct. 1185 (1995), provides little guidance on how a court should analyze this question. In that case, the Supreme Court did not address whether the clerical error leading to the arrest at issue rendered the arrest unconstitutional because the government had conceded that the arrest violated the Fourth Amendment.  *Id.* at 1189, n.1.[4]

---

[4]  Indeed, even in the first case in which the Supreme Court announced the good faith exception to the exclusionary rule, *United States v. Leon*, 468 U.S. 897 (1983), the Court was not faced with the question of whether the search was unconstitutional because that issue was not raised on appeal.  The Court only addressed whether the exclusionary rule should be modified.

9

Accordingly, the Court only examined the applicability of the good faith exception.

There is some confusion, then, as to when the Fourth Amendment is violated by a search or seizure that is based solely on a clerical error or mistake, and whether that question must be addressed separately from the question of whether the good faith exception to the exclusionary rule applies. This Court declines to adopt either of the categorical approaches suggested by the defendant and the government in this case.[5]   Instead, the Court adopts the Tenth Circuit's approach to the

---

[5]  Some state courts use the "collective knowledge" doctrine against the police and impute the knowledge that circumstances have changed to all police personnel, thereby rendering the stop *per se* unreasonable and, therefore, unconstitutional, anytime after the police receive information negating an initial report of illegal activity.  *See People v. Ramirez*, 668 P.2d 761, 764 (Cal. 1983) ("If we impute to the arresting officer the collective knowledge of law enforcement agencies for the purpose of establishing probable cause, we must also charge him with knowledge of information exonerating a suspect formerly wanted in connection with a crime."); *see also State v. White*, 660 So.2d 664, 667 (Fla. 1995) (quoting language from *Ramirez*).  Indeed, in a case with facts similar to this one, a Maryland state court of appeals explained that:

> In the case at bar the information possessed by the police team was an outdated, erroneous report of a stolen motor vehicle which the police had recovered on the same day it was taken. The police team, therefore, must be charged with the knowledge that the report was, in effect, rescinded when members of the Baltimore City Police Department recovered the car shortly after it was stolen. Accordingly, the erroneous information transmitted to Officer Nock and on the basis of which he arrested the appellant was clearly insufficient to show probable cause.

*Carter v. State*, 305 A.2d 856, 860 (Md. Ct. Spec. App. 1973) (emphasis added).  Although the arrest in *Carter* occurred two months after the car was recovered, that lapse of time appears to be irrelevant to the court's conclusion.  The court reasoned that the police team must be charged with the knowledge when the members of the police recovered the car.  The Court also declines to use this logic employed in these state court decisions.  Because the "touchstone" of the Fourth Amendment is reasonableness, *Mimms*, 434 U.S. at 108-09, the Court focuses on that question, rather than adopt bright-line legal theories which might short cut its inquiry.

10

question posed here and applies a two-pronged inquiry.[6]  *See Herrera*, 444 F.3d at 1248.  First, the Court will examine whether the search was unreasonable under the Fourth Amendment by assessing whether the clerical error upon which it was premised was itself unreasonable.  Second, the Court will look to the good faith exception to the exclusionary rule to determine whether it is applicable in the circumstances presented and, thus, allows use of evidence obtained from an otherwise unconstitutional search.  While there is some overlap in the facts pertinent to each of these inquiries, they are analytically distinct.

### B.    The Legality of the Stop

In assessing the reasonableness of the traffic stop, the Court first rejects the government's argument that the officer's objectively reasonable reliance on the roll call information renders the traffic stop constitutionally reasonable.  While it is true that an officer generally is entitled to rely on a report from another officer under the "collective knowledge" doctrine or "fellow officer" rule, *see Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989), the Supreme Court has explained that even objectively reasonable reliance on erroneous or flawed information does not cleanse an otherwise unconstitutional search or seizure.  *See Whiteley*, 401 U.S. 560, 568 (1985); *Hensley*, 469 U.S. at 232.

In *Whiteley*, a Wyoming county sheriff obtained an arrest warrant for the arrest of individuals based on "nothing more than the [sheriff's] conclusion that the individuals named therein perpetrated the offense described in the complaint."  *Whiteley*, 401 U.S. at 565.  The sheriff issued a statewide

---

    [6]  Although the Court adopts the framework applied by the Tenth Circuit in *Herrera*, the Court does not express an opinion on how that framework was applied to that case.  Thus, the Court does not address whether a court should even consider the good faith exception to the exclusionary rule when a police officer relies on his own mistake, as opposed to, as here, a mistake made by a third party.

radio bulletin with a description of the suspects, the crime allegedly committed, and, on at least one version of the bulletin, the fact that a warrant had issued. *Id.* at 564. Police in a different county, Laramie, acting entirely on the information in the bulletin, stopped the suspects and searched their car. *Id.* at 563. The Supreme Court held that the search and seizure violated the defendants' Fourth Amendment rights. *Id.* at 568. In so finding, it explained that:

> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, <u>an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.</u>

*Id.* (emphasis added).

Similarly, in *Hensley*, 469 U.S. at 232, the Supreme Court held that it was constitutionally reasonable for police officers to rely on a "wanted flyer" from another police department in conducting an investigative stop, where the flyer itself was based on articulable facts supporting the requisite suspicion. It noted, however, that, "[i]f the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." *Id.* at 232. Likewise, in the present case, Officer Zubal's reliance on another officer's error does not make the traffic stop constitutional if the error itself was unreasonable.

Next, the Court must also reject the government's argument that this case presents a mistake-of-fact situation that does not render the traffic stop unconstitutional as long as it was an objectively reasonable mistake. First, the government does not cite any cases in which the police rely on their

12

own unreasonable clerical error in mistakenly executing a traffic stop.[7]  This is not a case in which

there was some factual underpinning that supported the officer's reasonable suspicion on which he

was slightly mistaken - such as the degree to which a window is tinted that may violate applicable

laws.  The "fact" in this case was the presence of a vehicle on a report that would not have been there

but for police oversight.  As a leading treatise on Fourth Amendment law, in discussing the result

in *Carter v. State, supra*, explained, "[t]he point is <u>not</u> that probable cause is lacking because it

turned out that the 'facts' upon which the officer acted were actually not true, for quite clearly

information sufficient to establish probable cause is not defeated by an after-the-fact showing that

this information was false . . . Rather, the point is that the police may not rely upon incorrect or

---

[7]  Although the government did not cite this case, the Court discovered a Sixth Circuit opinion that warrants some discussion on this point.  In *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809 (6th Cir. 1999), a melee or "uprising" occurred outside of a bar late in the evening where two on-duty police officers, Deputies Schutte and Hopper, were present. During the fighting, the officers mistakenly believed that a security guard had been shot and was likely dead.  At some point, Deputy Schutte radioed to his partner that he saw suspects fleeing the scene in a car, but his description of the car was "sketchy at best" due to "the time of night, the frantic situation outside the bar, and dust that blew up from the ground as a result of the general disorder in the parking lot." *Id.* 811-12.  Deputy Hopper then pursued the vehicle, and Deputy Schutte described the suspects by counting how many cars ahead of Deputy Hopper the suspects' vehicle was driving.  Deputy Hopper, however, did not understand Deputy Schutte's "car-counting," and stopped the incorrect vehicle.  In a subsequent action under 42 U.S.C. § 1983, the Sixth Circuit held that the stop did not violate the Fourth Amendment because Deputy Schutte's description of the car constituted "specific and articulable" facts, and Deputy Hopper "reasonably believed" but "merely misunderstood" his partner's radio message. *Id.* at 813-14. Judge Clay dissented, relying in part on *Hensley* and concluded that both the "bulletin" from Deputy Schutte and Deputy Hopper's reliance on it were unreasonable.  Although this case seems to support the government's position facially, it is distinguishable because the Sixth Circuit concluded that Deputy Schutte's description of the car was not actually a mistake or unreasonable, only that there was a miscommunication.  As such, it was not a case where an officer relied on another officer's mistake.  Moreover, even if there was a mistake, it was a mistake of perception that generally supports the mistake-of-fact argument the government makes in the present case, not a clerical error that indicates the existence of a record that no longer exists, as is true in the case at bar.

13

incomplete information when they (or perhaps some other government official) are at fault in permitting the records to remain uncorrected." Wayne R. LaFave, 2 SEARCH AND SEIZURE § 3.5 (4th ed.) (emphasis in original).  The government's position, therefore, must be rejected.[8]

Rather than looking at whether Officer Zubal reasonably relied on a mistake-of-fact, the central question, as indicated above, is whether the mistake (not Officer Zubal's, but the department's) that led to the stop was reasonable.  The only evidence regarding who is responsible for the mistake indicates that the mistake was made by Sergeant Caraballo, who included the Chevy Cavalier on his roll call report as a stolen vehicle, despite the fact that the vehicle had been reported recovered and removed from LEADS over four hours prior to the roll call.

The government bears the burden of showing that reasonable suspicion supports an investigative seizure.  *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990).  Because the reasonableness of the stop in this case turns on the reasonableness of the mistake that led to the stop, the government bears the burden of demonstrating that the failure to communicate accurate

---

[8]  The Supreme Court of Nebraska also clearly articulated why a mistake-of-fact argument is not applicable in this context. *See State v. Allen*, 690 N.W.2d 582 (Neb. 2005).  In *Allen*, the court explained that:

> This is not a case in which police possess factual information supporting a reasonable suspicion of criminal activity which, upon further investigation, proves to be unfounded. Here, there was no factual foundation for the information which the dispatcher transmitted to Sautter, as it is undisputed that the information was false due to the dispatcher's mistake in running the wrong license plate number. Sautter had no other reason for initiating the stop. Thus, the record reflects that neither Sautter nor any other law enforcement personnel possessed any true fact which would support the reasonable suspicion necessary to justify an investigative stop. The stop was therefore an unreasonable seizure in violation of the Fourth Amendment.

*Id.* at 590.

14

information at the roll call meeting was reasonable under the circumstances.

On this point, the government has failed to present any evidence sufficient to show how or why the mistake was made.  In its brief in opposition to the Motion to Suppress, as well as in the testimony the government's counsel elicited at the suppression hearing, the government focused almost entirely on Officer Zubal's reasonableness in relying on the information.  Indeed, it glossed over the reason for the erroneous roll call report in its brief, stating that, "Officer Zubal, for whatever reason, was never told that the vehicle in question had been recovered, even though someone in the Youngstown Police department was aware of this."  (Doc. 20, at p. 8) (emphasis added.)[9]  The government only called one witness to testify at the suppression hearing - Officer Zubal.  There was no attempt to have Sergeant Caraballo explain how he prepared the roll call report, where he obtained the information, whether he not he checked LEADS in preparing the report, how easy it would be to check LEADS to confirm the accuracy of the report, how long prior to the start of the meeting he updated the report, etc.  The most relevant testimony on this point was from Officer Zubal stating that Sergeant Caraballo read off of a printed report, but Officer Zubal did not know what that report was.  The only other relevant testimony on this point was elicited by the Court.  In response to the Court's questions, Officer Zubal testified that he had never gotten "bad" information from a roll call report before, that he did not know any other officer who received "bad" information, and that the acting commander prepares the report personally.

Simply put, the only evidence the Court has about Sergeant Caraballo's roll call report is that

---

[9]  Although it indicated generally that the size of an organization, relevant procedures, and shift changes might be considered in how police reports are disseminated, there is nothing to indicate how the particular report in question was produced, or even how acting commanders generally prepare these roll call reports.

the recovered auto report was cleared four hours and twenty minutes prior to the roll call hearing in which it was still indicated as stolen, and that the acting commander read the roll call report from a "printed report" that he prepared himself. Although four hours and twenty minutes is a relatively short period of time for a police record to be out-of-date, there is simply no evidence to persuade the Court that the mistake was reasonable in this case. The Court does not doubt that there may be an adequate explanation for the mistake, but there are also several scenarios in which this mistake would be unreasonable. The Court's function, however, is not to speculate as to reasons that might save a party that has failed its evidentiary burden.

It is worth noting, moreover, that the fact that Officer Zubal is not aware of any erroneous information being given at roll call on prior occasions is more relevant to the reasonableness of his reliance on the report, not to the reasonableness of Sergeant Caraballo's mistake. And, as *Whiteley* and *Hensley* teach, even objectively reasonable reliance on constitutionally deficient information from a fellow officer does not cleanse an unlawful seizure. Accordingly, that fact is not persuasive. The Court, therefore, must conclude that the mistake in this case was not reasonable under the circumstances.[10]

In addition, the Court's conclusion is bolstered by the fact that this is not a case in which the

---

[10] The Court's conclusion is based only on the error made at the roll call meeting in conveying inaccurate information; it finds that Officer Zubal otherwise acted reasonably in conducting the stop. Regarding whether he could have checked LEADS prior to conducting the stop, Officer Zubal testified that, if he switched to Channel 2 to check the license place on LEADS, he would have lost contact on Channel 1, which would have cut him off from radio dispatch and fellow officers in the midst of what he believed to be a dangerous traffic stop. Given that Officer Zubal reasonably believed that a vehicle pursuit might arise from his attempt to stop the Chevy Cavalier, he was reasonable in not first checking LEADS before stopping the vehicle. The Court finds, moreover, based on its observations at the suppression hearing, that Officer Zubal was a credible witness, and that his testimony and beliefs are entitled to significant weight.

16

mistake was one of omission or failure to act, such as the failure to update a record in a computer or the failure to report to another department that a warrant had been quashed or vacated.  In this case, an officer took the affirmative action of conveying information to officers about to begin their patrol, intending that the officers would act on that information in the direct future.  In doing so, he had sources of information - including LEADS - through which he could have ascertained the accuracy of the information he conveyed.  In such a situation, it is reasonable to impose a higher duty of care on the officer to act reasonably and, to the extent possible, to assume that the information he passes on is correct.  In this case, the government failed to satisfy its burden of showing that Sergeant Caraballo acted with the requisite care.

Because the Court concludes that the clerical mistake leading to the traffic stop was not reasonable, the Court concludes that the traffic stop in this case was an unconstitutional seizure.

### C.  The Good Faith Exception to the Exclusionary Rule

The exclusionary rule generally provides that evidence secured through an unlawful search or seizure should be barred from use at trial as a "deterrent safeguard" against future violations of the Fourth Amendment.  *See Mapp v. Ohio*, 367 U.S. 643, 648 (1961).  The Supreme Court has held that the rule is "a judicially created remedy," not a constitutional requirement.  *Leon*, 468 U.S. at 906.

In *Leon*, the Supreme Court announced an exception to the exclusionary rule, holding that the exclusionary rule should not be applied so as to bar the use of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid.  *Id.* at 922.  In so holding, the Court based its decision on three factors: (1) the exclusionary rule was historically designed "to deter police misconduct rather than

17

to punish the errors of judges and magistrates;" (2) there was "no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion;" and (3) of greatest importance to the *Leon* Court, there was no basis "for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." *Illinois v. Krull*, 480 U.S. 340, 348 (1987) (quoting *Leon*, 468 U.S. at 916-17)).

The rationale for the exception announced in *Leon* has also been applied by the Supreme Court in certain discrete situations, including an officer's reliance on a legislative act that is later declared unconstitutional, *Krull*, 480 U.S. at 350-51, and, most recently, an officer's reliance on clerical errors of court employees, *Evans*, 115 S. Ct. at 1194.

In *Evans*, a police officer conducted a lawful traffic stop of a vehicle and, during the stop, learned from a "computer data terminal located in his patrol car" that there was an outstanding misdemeanor warrant for the driver. *Id.* at 1188. He arrested the driver pursuant to the warrant, and a subsequent search revealed a bag of marijuana. *Id.* Thereafter, the Justice Court learned that the warrant had been quashed seventeen days prior to the arrest, but that the warrant was not removed from the Sheriff's Office computer because of a clerical error. *Id.* Although the Arizona state trial court never determined whether the error was made by a court employee or police personnel (it suppressed the evidence, finding it irrelevant whether the mistake was made by court staff or police personnel), the United States Supreme Court's decision expressly applies only to clerical errors by court employees. *Id.* at 1188, 94. The Arizona Supreme Court upheld that trial court's decision to suppress the marijuana, and the United States Supreme Court reversed, finding that the three factors discussed in *Leon* supported application of the good faith exception. *Id.* at1193.

18

In addressing the first two factors, the Court held that the exclusionary rule was historically designed to deter *police* misconduct, not mistakes by court employees; and that there was no evidence that court employees are inclined to ignore or subvert the Fourth Amendment, or that lawlessness among these actors requires application of the extreme sanction of exclusion. *Id.* As to the last factor, the Court stated the following:

> Finally, and most important, there is no basis for believing that application of the exclusionary rule in these circumstances will have a significant effect on court employees responsible for informing the police that a warrant has been quashed. Because court clerks are not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime, they have no stake in the outcome of particular criminal prosecutions.

*Id.* (emphasis added). Accordingly, it concluded that the threat of exclusion could not be expected to deter individuals from failing to inform police officials that a warrant had been quashed. *Id.* In so finding, the Court announced "a categorical exception to the exclusionary rules for clerical errors of court employees." *Id.* at 1194.

In a concurrence, Justice O'Connor emphasized that the court clerk's error was not the only error that the majority should have reviewed; it also should have looked at the reasonableness of the police officer's reliance on that error, i.e., whether the officer had reason to believe that the recordkeeping system itself was reliable. She explained that, "[s]urely it would not be reasonable for the police to rely, say, on a recordkeeping system, their own or some other agency's, that has no mechanism to ensure its accuracy over time and that routinely leads to false arrests, even years after the probable cause for any such arrest has ceased to exist." *Id.* at 1194 (O'Connor, J., concurring) (emphasis in original).

In determining whether the good faith exception applies in this case, the Court must consider

whether the Supreme Court has carved out a categorical exception to the exclusionary rule for reliance on certain actions of certain parties (warrants issued by detached and neutral magistrates, statutes or regulations passed by a legislature, or clerical errors of court employees), or whether the rationale for the good faith exception otherwise applies to the case at hand.  If so, the Court must consider whether the officer's reliance on the mistake was reasonable.

As to the first question, to date, the Supreme Court has never extended the good faith exception to police errors, and it expressly declined to consider whether it should be extended in *Evans*.  *Evans*, 115 S. Ct. at 1194, n.5.  Unfortunately, the Sixth Circuit also has not yet had an opportunity to squarely address whether *Evans* should be extended to mistakes made by police personnel.  Several courts *have* addressed this issue, however, with varying outcomes.

The Supreme Court of Nebraska has spoken most clearly against extending the *Evans* rule to errors by police personnel.  In *State v. Allen*, 690 N.W.2d 582, 586 (Neb. 2005), the Supreme Court of Nebraska  specifically rejected application of *Evans* to an error by a dispatcher who ran the wrong license plates through the police database and reported to an officer that the plates did not match the vehicle to which they were attached. In that case, the court found that the dispatcher is a person that can fairly be characterized as an "adjunct to the law enforcement team*,*" *Id.* at 590 (quoting *Evans*, 115 S.Ct. at 1193), and that exclusion of the evidence would likely cause officers and dispatchers to exercise greater care.  *Id.* at 593.

The First Circuit also addressed this question, and did so in factual circumstances which were quite similar to those at issue here, in *United States v. Gines-Perez*, 90 Fed.Appx. 3 (1st Cir. 2004) (unpublished decision).   The procedural posture of that case, however, did not require the court to give a definitive answer.  In that case, the facts were introduced as follows: "[t]here is no dispute that

20

Gines-Perez's car was originally stopped because, and only because, it was reported stolen; that the report was based on incorrect information in a computer database used by the Puerto Rico police; that police error caused the database to be incorrect . . ." *Id.* at 3.  The district court in that case applied the *Evans* good faith exception to the police errors, and the First Circuit vacated and remanded the district court decision for consideration of whether reasonable suspicion existed based on factors other than the erroneous police report.  In doing so, the First Circuit did not go so far as to hold that the good faith exception never would apply to law enforcement errors, but did note that "[w]e are troubled by the district court's reading of *Evans* as extending the good faith exception to reliance by an arresting officer on faulty computer database information due to police error." *Id.* at 4.

The Tenth Circuit and the Second Circuit have emphasized that the *Evans* rule turns on the identity of the person making the mistake, implying that those Circuits would hesitate to extend *Evans* to mistakes by anyone other than court employees.  *See United States v. Santa*, 180 F.3d at 30 (2d Cir.1999) ("The outcome of *Evans*, however, did not turn on the particular type or magnitude of error, but on the identity of the individuals responsible for the error."); *United States v. Herrera*, 444 F.3d 1238, 1250 (10th Cir. 2006) ("Thus, the application of *Leon's* good faith exception to the exclusionary rule turns to a great extent on whose mistake produces the Fourth Amendment violation.").  Neither *Santa* nor *Herrera*, however, are very instructive for present purposes.  The *Santa* court found that the mistake was actually made by a court employee and, thus fell squarely within the *Evans* facts, *Santa*, 180 F.3d at 29, and *Herrera* involved a police officer's reliance on his own mistake of perception, not on a clerical error of other police personnel, *Herrera*, 444 F.3d at 1249.

21

The Tenth Circuit, in a case before *Herrera*, did agree with a district court's decision to refuse to extend *Evans* to mistakes made by a police dispatcher and a police officer. *United States v. Shareef*, 100 F.3d 1491, 1503 (10th Cir. 1996) ("We agree with the district court that the exclusionary rule applies when an error by a dispatcher or an officer leads to a Fourth Amendment violation."). In *Shareef*, however, the Tenth Circuit concluded that the underlying error was reasonable and, thus, that no Fourth Amendment violation occurred. *Id.* Its statement regarding *Evans*, therefore, is dicta.

On the other hand, the Fourth Circuit and the Fifth Circuit clearly have extended *Evans* to situations involving errors by police personnel, *United States v. Williams*, 1998 WL 276460 (4th Cir. May 27, 1998) (unpublished decision) (mistakes by employees of sheriff's office that the court labeled "clerical employees"); *United States v. De Leon-Reyna*, 930 F.2d 396 (5th Cir. 1991) (en banc) (per curiam) (mistake between officer and dispatcher regarding a license plate number on a vehicle, reaffirmed post-*Evans*).[11] Probably the most far-reaching endorsement of the application of *Evans* to police errors is the Fifth Circuit's decision in *De Leon-Reyna* which, although a pre-*Evans* decision, was relied upon in a post-*Evans* opinion. *See United States v. Castaneda*, 2001 WL 1085086, at *1 (5th Cir. Aug. 29, 2001) (unpublished decision) (noting that the Supreme Court has remained silent on the issue of whether the good faith exception applies to police errors, but citing

---

[11] In addition, the Court of Appeals for the District of Columbia recently applied *Evans* to an error by a Department of Motor Vehicles employee. *United States v. Southerland*, 2007 WL 1574612 (D.C. Cir. June 1, 2007) (only Westlaw citation available as of date of this opinion). Although a DMV employee is more akin to the court employee in *Evans* than to police personnel, the D.C. Circuit Court expressly did not answer the question of whether a DMV employee could be considered a "fellow officer," finding only that, under *Leon* and *Evans*, no deterrent effect would be served by exclusion of the evidence and, therefore, that the good faith exception applied. *Id.* at *5.

*De Leon-Reyna* and stating that "we have held that the good-faith exception to the exclusionary rule applies regardless of whether the error was by court clerks or police personnel.").

In *De Leon-Reyna*, a United States Border Patrol Agent observed a truck that raised his suspicions for several reasons unimportant for the present analysis. *De Leon-Reyna*, 930 F.2d at 397-98. Based on his suspicions, the agent radioed the license plate number of the truck to a dispatcher. *Id.* at 398. The agent did not follow his unit's policy of using a word designation for the letters when he read them to the dispatcher, and the dispatcher did not ask the agent to repeat the information. *Id.* The dispatcher heard one of the letters as an "N" rather than "M" and returned a vehicle registered to those plates that was different than the vehicle the agent observed. *Id.* The agent stopped the vehicle based in large part on that information, and, after waiting for a drug sniffing dog to arrive, discovered over half a ton of cocaine in a false compartment in the truck. *Id.* The district court suppressed the evidence because the stop was based on erroneous information that resulted from the law enforcement's own negligence, and a Fifth Circuit panel affirmed. The Fifth Circuit granted a petition for a rehearing en banc and reversed the district court. *Id.*

In an 11-3 decision, the en banc court delivered an opinion per curiam, holding that, "regardless of whether [the agent] was negligent in failing to follow his unit's code word policy, his good faith reliance on the license report information . . . was objectively reasonable," and thus the license plate report could be considered in determining whether the stop was reasonable and whether the good faith exception applied. *Id.* at 399. The court went on to find that the good faith exception to the exclusionary rule "applies to cases in which a police officer errs," and applied the rule in that case without deciding whether the stop was unconstitutional. *Id.* at 400-01. In so finding, the court explained that the code word policy that the agent failed to use was not "constitutionally mandated"

23

and only made license reports from dispatchers 20 points more reliable on the court's hypothetical 100 point scale of reliability.  *Id.* at 400.  Accordingly, the court held that the agent could have reasonably relied on the license plate information report.  *Id.* at 400.

Notably, the decision of the Supreme Court of Nebraska in *State v. Allen*, discussed above, was based on almost identical facts and produced an opposite result.  In *State v. Allen*, the Supreme Court of Nebraska first distinguished *De Leon-Reyna* on the basis that other grounds for reasonable suspicion existed in *De Leon-Reyna*, but also expressly stated that "we question the concept of 'discounting somewhat' incorrect information resulting from police negligence." *State v. Allen*, 690 N.W.2d at 591.  Continuing, it agreed with the dissenting Fifth Circuit judges that "erroneous information created by the negligent conduct of a law enforcement officer cannot be used to support a finding that the officer acted reasonably."  *Id.* (quoting *De Leon-Reyna*, 930 F.2d at 402 (Thornberry, J., dissenting)).

This Court also has concerns about the Fifth Circuit's decision in *De Leon-Reyna* for several reasons.  First, the fact that an officer's mistake was negligent makes that mistake, by definition, unreasonable.  A traffic stop justified by an unreasonable mistake would seem to be a violation of the Fourth Amendment, a question the Fifth Circuit did not reach (it only stated that it "likely did not" violate the Fourth Amendment).  The gist of the holding, moreover, is that evidence will not be suppressed if a police officer reasonably relies on his <u>own</u> unreasonable mistake, which seems to be a logical impossibility.[12]  Most concerning, however, is the sweeping conclusion that "the good faith exception applies to cases in which a police officer errs, but nevertheless maintains a good faith

---

[12]  Although the record probably supported a finding that the dispatcher was also negligent, the government in that case conceded that the officer was negligent for failing to follow radio procedures.  *De Leon-Reyna*, 930 F.2d at 399.

and objectively reasonable belief that he has an adequate foundation to make a stop." *De Leon-Reyna*, 930 F.2d at 400-01. This Court cannot agree that, as a categorical rule, if a police officer's error forms part of the officer's belief, even in good faith, that he has an adequate foundation to make a stop, the good faith exception applies to permit admission of the evidence.

This Court finds that neither the broad extension nor rejection of the *Evans* rule to police errors is warranted. Rather, it finds that the more sensible approach is to consider whether the good faith exception applies on a case-by-case basis according to the rationale employed in *Leon*. *See Williams*, 1998 WL 276460 (applying *Leon* rationale and determining that exclusion would not have a deterrent effect on clerical employees of sheriff's office that made mistakes). As noted above, the *Leon* Court considered the following three factors: (1) the exclusionary rule was historically designed "to deter police misconduct rather than to punish the errors of judges and magistrates;" (2) there was "no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion;" and, (3) of greatest importance to the Court, there was no basis "for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." *Krull*, 480 U.S. at 348 (quoting *Leon*, 468 U.S. at 916-17)).

In the present case, the evidence indicates that the mistake was made by the acting commander, or highest ranking officer on the shift, which was Sergeant Caraballo. The government did not satisfy its burden of demonstrating that the mistake was reasonable. It is clear that a high ranking police officer is not like a judge, magistrate, court employee, or other neutral party, in that police officers are the precise target of the exclusionary rule. It is exactly the conduct of police officers that the exclusionary rule was meant to affect. The only question is whether the exclusion

of evidence in this case will have a significant deterrent effect on officers in these circumstances. In this case, because a high-ranking police officer is involved, the answer must be that it will.

Unlike magistrates, judges, court employees, clerical employees of a sheriff's office, or DMV employees, not only is Sergeant Caraballo an "adjunct[] to the law enforcement team," *Leon*, 468 U.S. at 917; *Evans*, 115 S. Ct. at 1194, as the acting commander of the shift, he was the acting leader of the law enforcement team at that time. Indeed, it is hard to imagine someone who has a greater "stake in the outcome of particular criminal prosecutions." *Id.* Significantly, deterrence of misconduct or negligent conduct by a high-ranking officer likely has a greater impact than on a field officer, especially where, as in this case, the high-ranking officer is responsible for disseminating information to an entire shift of officers for them to act upon in the course of their duties.

In addition, the exclusionary rule should be applied even though there are no allegations of deliberate of willful misconduct in this case; it is enough that exclusion of evidence will deter negligent conduct. The Supreme Court has explained that "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, <u>or at the very least negligent</u>, conduct which has deprived the defendant of some right." *Michigan v. Tucker*, 417 U.S. 433, 447 (1974); *United States v. McClain*, 444 F.3d 537, 540 (6th Cir. 2006) (quoting same). In her dissent in *Evans*, Justice Ginsburg touched on this issue in a footnote, writing that "[i]t has been suggested that an exclusionary rule cannot deter recklessness, but can affect only intentional or reckless misconduct. This suggestion runs counter to a premise underlying all of negligence law - that imposing liability for negligence, *i.e.*, lack of due care, creates an incentive to act with greater care." *Evans*, 115 S. Ct. at 1200, n.5 (Ginsburg, J., dissenting). Likewise, in excluding evidence that resulted from a police computer error, the Supreme Court of Florida explained that "[t]his type of

26

police negligence fits squarely within the class of governmental action that the exclusionary rule was designed to deter, i.e., police negligence or misconduct that is likely to be thwarted if the evidence seized is suppressed. Suppression of evidence seized pursuant to police computer error will encourage law enforcement agencies to diligently maintain accurate and current computer records." *State v. White*, 660 So.2d 664, 667 (Fla. 1995). Excluding evidence to deter negligent conduct, therefore, is proper because the exclusionary rule has long been understood to apply to negligent as well as willful misconduct, *see Tucker*, 417 U.S. at 447, and because there is sound rationale for deterring negligent as well as intentional misconduct.[13]

Significantly, the government also bears the burden of showing that the good faith exception applies. *See Santa*, 180 F.3d at 25; *see also United States v. Henderson*, 229 F.Supp.2d 35, 41 (D. Mass. 2002) ("There is a significant dispute as to whether the judicially crafted exclusionary rule operates to suppress the evidence subsequently seized or if the 'good faith' exception recognized by the Supreme Court in *Evans* applies in this case. On this issue too, the burden of proof is on the government."). The government, again, has failed to meet its burden with respect to this issue. Its sole argument (other than standing, addressed below) has been that objectively reasonable reliance on a mistake of fact renders the traffic stop constitutional. It did not cite a single case that even mentions the *Evans* decision, even at the suppression hearing when the Court specifically asked counsel for the government about its response to the defendant's position that *Evans* could not be extended to the present case. As such, although the Court concludes independently that the good faith exception does not apply in this case, it is significant that the government has offered no

---

[13] Another sound reason for applying the exclusionary rule to deter negligent conduct is that the issue of whether misconduct is deliberate or negligent is one that would be difficult, if not impossible, for defendants to prove in many situations.

argument to rebut that conclusion.

Having determined that the traffic stop was an unconstitutional seizure and that the good faith

exception does not preclude application of the exclusionary rule, the Court next must determine

whether, under the circumstances of this stop, the scope of the exclusionary rule reaches the

evidentiary fruits Anderson seeks to suppress.[14]

### D.     Scope of Evidence to Be Suppressed

The parties frame this question as a standing issue - i.e., debating whether Anderson has

standing to challenge the search of his person in this case.  The Court, therefore, uses the same

framework.[15]  There is no question that Anderson has standing to challenge the legality of the traffic

stop.  *Brendlin v. California*, --- S. Ct. ---, (U.S. June 18, 2007); *United States v. Perez*, 440 F.3d

363, 369 (6th Cir. 2006) ("Because [an automobile stop] affects the Fourth Amendment interests of

all the occupants, Perez as the driver and Rhodes as a passenger may each challenge his detention

_____

[14]  Though the Court does not reach whether Officer Zubal's reliance on the mistake was reasonable, it emphasizes that the Court would very likely conclude that Officer Zubal reasonably relied on the error in this case.  As stated above, Officer Zubal is entitled to rely on information from another officer under the "collective knowledge doctrine" or "fellow officer rule," without having first hand knowledge.  In addition, Officer Zubal testified that he had never received erroneous information regarding stolen vehicles from a roll call report, nor had he ever heard of another officer receiving bad information.  This is not a case, therefore, where a recordkeeping system "routinely leads to false arrests," such that Officer Zubal should not have reasonably relied on it.  Officer Zubal, therefore, was objectively reasonable in relying on the report from roll call when he conducted the traffic stop.

[15]  "Standing" in this context is used as shorthand for the question of whether a litigant's Fourth Amendment rights have been implicated.  As the First Circuit noted in *United States v. Sanchez*, 943 F.2d 110, 113 n.1 (1st Cir. 1991), standing technically has not had a place in Fourth Amendment jurisprudence since the Supreme Court indicated in *Rakas v. Illinois*, 439 U.S. 128 (1978) that standing to challenge searches and seizures involved substantive Fourth Amendment law.  Because much of the relevant case law, as well as the parties in this case, refer to this concept as standing, the Court uses that term as well.

during the stop of the Escalade.").  In this case, the officers conducted a full felony traffic stop of the Chevy Cavalier with guns drawn, and Officer Zubal testified that it was his intent to stop all the occupants of the vehicle, and that none of the occupants were free to leave.  (Tr. at 17, 34.)

The government does not argue that Anderson cannot challenge the legality of his detention or seizure as a result of the felony traffic stop, and it does not argue that Anderson was not "searched" when Officer Zubal reached inside of his coat pocket (or alternatively, that his consent was not coerced based on the circumstances); it argues that Anderson does not have a possessory interest in the car, such that he cannot challenge the subsequent search that led to the discovery of his gun.  In support of this argument, the government relies primarily on *United States v. Carter*, 14 F.3d 1150 (6th Cir. 1994).  In *Carter*, the Sixth Circuit held that, although a passenger may contest an unlawful detention during a traffic stop, it did not follow that he could suppress evidence obtained during a subsequent search of the vehicle under the "fruit of the poisonous tree" doctrine.  *Id.* at 1154.  Significantly, the Sixth Circuit in *Carter*, in distinguishing an Eighth Circuit opinion relied on by the defendant, expressly stated that "[l]ike anyone else, moreover, a passenger has a legitimate expectation of privacy in his person and in the garments that he . . . is wearing."  *Id.*

As the plain language of *Carter* makes clear, that case is not applicable to the case at bar. *Carter* involved the search of a <u>vehicle</u> subsequent to a traffic stop, not the search of the passenger himself, as is the case here.  *See United States v. Davis*, 2007 WL 490088 (N.D. Ohio Feb. 8, 2007) (O'Malley, J.) (discussing in detail the extent a passenger's standing to challenge a search subsequent to a traffic stop).  In the present case, Officer Zubal recovered Anderson's gun from inside Anderson's coat pocket, a place in which Anderson undoubtedly enjoys a reasonable

expectation of privacy.[16]  U.S. Const. amend. IV (protecting "[t]he right of the people to be secure in their persons . . . and effects . . .") (emphasis added).

The government's standing argument relates only to the gun, it does not argue that Anderson's alleged statement in the back of the cruiser was so far removed from the unlawful stop so as to be admissible.  The Court, therefore, concludes that Anderson may suppress all evidence obtained as a result of the unlawful seizure in this case.

### III.    CONCLUSION

For the foregoing reasons, Anderson's Motion to Suppress (Doc. 19) is **GRANTED**, and all evidence obtained as a result of the unlawful traffic stop must be **SUPPRESSED**.[17]

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY
UNITED STATES DISTRICT JUDGE**

**Dated: June 21, 2007**

---

[16]  Alternatively, the government also seems to argue that the officer's discovery that the front seat passenger had a gun prior to searching Anderson removed the "taint" of the unlawful seizure and made the search of Anderson so attenuated that the gun was no longer the "fruit of the poisonous tree."  *See United States v. Smith*, 386 F.3d 753, 763 (6th Cir. 2004) ("Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation."). The Court, however, does not find that the officers' decision to search the front seat passenger first is enough of a break in the chain of events to remove the "taint" of the traffic stop. Accepting that argument would lead to the absurd result that one passenger could suppress evidence while the other could not based solely on which one the officers chose to search first. Moreover, Officer Zubal indicated that, at the time he stopped the vehicle, he intended to frisk all the passengers.  The Court concludes, therefore, that Anderson's gun was the fruit of the unlawful traffic stop, and that there was no break in the chain of events to remove the taint of the stop.

[17]  A separate trial order will follow.